Slip Op. 08 - 76

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

<table>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>HARLEY & MYRA DORSEY, d/b/a<br>CONCORDE FARMS,</td><td>:<br>:<br>:</td><td></td></tr>
<tr><td style="text-align:center">Plaintiffs,</td><td>:<br>:</td><td></td></tr>
<tr><td style="text-align:center">v.</td><td>:<br>:</td><td>**Before: MUSGRAVE, Senior Judge**<br>Court No. 06-00449</td></tr>
<tr><td>UNITED STATES SECRETARY OF<br>AGRICULTURE,</td><td>:<br>:<br>:</td><td></td></tr>
<tr><td style="text-align:center">Defendant.</td><td>:<br>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
</table>

[Administrative reconsideration of an application for trade adjustment assistance cash benefits remanded for further consideration.]

Dated: July 11, 2008

### OPINION AND ORDER

*Steven D. Schwinn*, Associate Professor of Law, The John Marshall Law School, for the plaintiffs.

*Gregory G. Katsas*, Acting Assistant Attorney General; *Jeanne E. Davidson*, Director *Patricia M. McCarthy*, Assistant Director, Civil Division, Commercial Litigation Branch, United States Department of Justice (*Delisa M. Sanchez*), and Office of the General Counsel, U.S. Department of Agriculture, International Affairs and Commodity Programs Division (*Jeffrey Kahn*), of counsel, for the defendant.

On remand of Harley and Myra Dorsey's application for trade adjustment assistance

("TAA") cash benefits to the U.S. Department of Agriculture ("Agriculture"), Foreign Agricultural

Service ("FAS"), for reconsideration of whether their TAA net farm income declined (*see Dorsey

v. U.S. Secretary of Agriculture*, Slip Op. 08-14 (Jan. 25, 2008), *recons. denied*, Slip Op. 08-32 (Mar.

19, 2008), familiarity with which is presumed), FAS has again reached a negative determination.

FAS first found the operation of the "wind machine" necessary for and directly connected to the Dorseys' farm business.  *See Reconsideration Upon the Second Remand of the Application of Concorde Farms* ("*Reconsideration*") at 3 (referencing *Wine Grape Establishment and Production Costs in Washington* (Coop. Ext., Wash. St. U., Farm Bus. Mgmt. Repts. EB1955 ("*WGEPC*")).[1]  The referenced internet publication implies such wind machines are used in the State of Washington in areas prone to frost and amounts to substantial evidence on the record to support the conclusion FAS drew.  *See WGEPC* at 18.

FAS then determined the Dorseys' TAA net income for 2003 was not distorted, and therefore their 2004 net income did not decline from 2003, by relying upon the wind machine's connection to farm business plus the fact that the Dorseys utilized the deduction for the wind machine allowed by section 179 of the Internal Revenue Code ("IRC"), 26 U.S.C. § 179, to reduce their 2003 taxable net income.  FAS found it "irrelevant" whether the section 179 deduction is "extraordinary" because it is a "legitimate tax deduction."  *See generally Reconsideration*.

The reviewing standard remains unchanged.  *See* Slip Op. 08-14 at 6-7.  For the reasons discussed below, the matter must again be remanded to FAS.

### *Discussion*

FAS's position indicates it considers net income for TAA purposes to be taxable net income, *i.e.*, whatever final net profit or loss figure a claimant "reports to the IRS" for tax purposes regardless of the factors comprising that IRS-reported net income.  While "an agency's interpretation of its own regulations is normally entitled to considerable deference[,]" *Perry v. Martin Marietta Corp.*, 47

---

[1]  Available at www.agribusiness-mgmt.wsu.edu/AgbusResearch/winegrape.htm (last visited this date).

F.3d 1134, 1137 (Fed. Cir. 1995) (citing *Udall v. Tallman*, 380 U.S. 1, 16-17 (1965)), FAS's interpretation conflicts with 7 C.F.R. § 1580.301(e)(6) and judicial precedent. FAS has not adequately addressed why the accelerated depreciation deduction for the wind machine does not distort the Dorseys' 2003 net income for TAA purposes.

I

A TAA applicant must show a decline in net farm income to obtain TAA cash benefits. 19 U.S.C. § 2401e(a)(1)(C). The statute requires Agriculture to *determine* "net farm income," *see, e.g.*, *Lady Kim T. Inc. v. U.S. Secretary of Agriculture*, 31 CIT ___, ___, 491 F.Supp.2d 1366, 1371 (2007), but Congress did not elaborate on what this means or entails. *See* 19 U.S.C. § 2401e(a)(1)(C). Entrusted with the duty to elucidate, Agriculture's definition of "net farm income" for TAA purposes read in relevant part "net farm profit or loss, excluding payments under this part, reported to the [IRS]" at the time of the Dorseys' application. *E.g.*, 7 C.F.R. § 1580.102 (2006). Defining net farm income as "net farm profit or loss" is tautological, however, and it is unclear whether "reported to the IRS" addresses the net farm income a claimant reports for tax purposes or "true" net farm income determined in accordance with generally accepted accounting principles ("GAAP"). They are not necessarily the same figure, and both are required or permitted to be "reported to the IRS." *See, e.g.*, *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 542 (1979); *American Auto. Ass'n v. United States*, 367 U.S. 687 (1961).

Agriculture's other regulation addressing "net farm income," 7 C.F.R. § 1580.301, provides interpretive assistance. It permits certification of a decline in net farm income through

> (i) Supporting documentation from a certified public accountant or attorney, or

> (ii) Relevant documentation and other supporting financial data, such as financial statements, balance sheets, and reports prepared for or provided to the [IRS] or another U.S. Government agency.

7 C.F.R. § 1580.301(e)(6). This regulation necessarily implies "reporting" of net profit or loss to the IRS in accordance with regulation 1580.102 does not, *per se*, determine a claimant's net farm income for TAA purposes. *Steen v. United States*, 468 F.3d 1357, 1363-64 (Fed. Cir. 2006). Further, the data to which regulation 1580.301(e)(6) refer do not exist in a vacuum: in the absence of explicit indication otherwise, they can only mean GAAP-compliant data. *Cf. id.* at 1364 ("we need not address in detail the circumstances in which other income or expenses may, or must, be considered in determining net fishing income" because the plaintiff "*does not contend that his tax returns distort the net amount of his income*") (italics added).

If "[t]he purpose of TAA is to assist producers to adjust to imports by providing technical assistance to all and cash payments to those facing economic hardship" as the result of import competition, *Trade Adjustment Assistance for Farmers*, 68 Fed. Reg. 50048, 50049 (Aug. 20, 2003), the purpose of the net income determination is to focus on the farm revenue impacted by imports. *See, e.g.*, 468 F.3d at 1361 ("when Congress used the broader term 'net farm income,' it meant to encompass *income from all farm products*," *i.e.*, only the income from *products* of farm activity), 1363 ("net income from all *farming . . . sources*") (italics added). Because the regulations, particularly 1580.301(e), implicitly define net farm income for TAA purposes as *economic* net income recognized in accordance with GAAP and not *taxable* net farm income, then if a question arises in the TAA context as to whether a net income figure "reported" to the IRS for tax purposes distorts the determination of TAA net income, any "distortion" thereof is to be evaluated in

accordance with 7 C.F.R. § 1580.301(e)(6) in light of GAAP.  *Cf. Transwestern Pipeline Co. v. United States*, 639 F.2d 679 (Ct. Cl. 1980) (GAAP deemed controlling on issue of capitalization and depreciation for taxation purposes of natural gas carrier's "line pack gas").[2]  The purpose of providing documentation of net farm income "reported to the IRS" under regulation 1580.102, thus, appears to be for credibility and self-verification of one's GAAP net income, but assuming it equates to taxable net income.  *See* 468 F.3d at 1364.  In any event, FAS has not adequately explained why the Dorseys' GAAP net farm income equates to taxable net income in the circumstances at bar.

## II

The Dorseys characterized their "highly accelerated" section 179 depreciation as "extraordinary" during this action.[3]  The *Reconsideration*'s analysis implicitly relies on the fact that

---

[2] *See also*, *e.g.*, *Thor Power Tool*, *supra*, 439 U.S. 522 (discussing "vastly different" objectives of financial and tax accounting).  *Cf. Westpac Pacific Food v. Commissioner*, 451 F.3d 970 (9th Cir. 2006) (GAAP-compliant accounting of impact of cash advances on cost of goods did not "clearly reflect" taxable income) *with American Auto.*, *supra*, 367 U.S. 687, *and Thai Pineapple Pub. Co., Ltd. v. United States*, 20 CIT 1312, 1320-21, 946 F.Supp. 11, 20 (1996) (agency must reject GAAP-consistent methodologies when they are distortive and do not reflect actual costs).

[3] That usage appears to be in a commonly-understood sense, but in the accounting context an "extraordinary item" is (1) "unusual in nature," in that it possesses a high degree of abnormality and is clearly unrelated or only incidentally related to the ordinary and typical activities of the enterprise, and (2) "infrequent," in that it is not reasonably expected to recur in the foreseeable future.  *See, e.g., Financial Guidelines for Agricultural Producers* (Farm Financial Standards Counsel (FFSC), Dec. 1997) ("*Guidelines*") at II-22; *see also* Accounting Principles Board ("APB") Opinion No. 30 (June 1973).  Extraordinary items are required to be reported separately on income statements

> because *they are likely to cause unusual distortions in the amount of net income or loss of a business from year to year*.  Separately stating these items permits users of financial statements to exclude them or make other adjustments in developing forecasts or projections of future income or loss of a business based on trends in past income or loss.

Charles H. Meyer, *Accounting and Finance for Lawyers* at 381 (3d ed. 2006) (italics added).  *See* APB Opinion No. 9 (1966).

income taxation is generally irrespective of "extraordinary" and ordinary income, but this masks the

fact that the tax laws and their administration are no less dependant upon the proper disclosure of

such matters.  Certainly the taxpayer bears responsibility for proper accounting in the preparation

and maintenance of books and his or her tax bill,[4] but explicit (and implicit) recognition of GAAP

accounting for extraordinary items in the IRC and regulations[5] underscores that without GAAP the

analysis of financial reporting, for tax purposes or otherwise, becomes an exercise in futility, or at

least of frustration.  And clearly, an accounting item's specific identification as "extraordinary" in

---

[4]  As an aside, the *Reconsideration* also states "[t]he exclusion of the deduction for depreciation on the wind machine would result in a knowing misrepresentation of plaintiffs' farm income in an effort to grant TAA cash benefits to an applicant that is not lawfully entitled to such benefits." *Reconsideration* at 4.  This appears gratuitous.  The question is simply whether the section 179 deduction is distortive of TAA net income, which involves consideration of appropriate accounting methodology.  *Cf.*, *e.g.*, Financial Accounting Standards Board ("FASB") Statement No. 154 (May 2005) (proper disclosure of changes in accounting and their effects on reported net income not misrepresentation).  Indeed, FAS's own analysis implicitly admits TAA net farm income *depends* on the depreciation methodology utilized and analytical perspective sought.  *E.g.*, *Reconsideration* at 3 ("[w]e recognize that a taxpayer's decision to expense certain property under Section 179 . . . affects the resulting net income of a farm"); *id.* (quoting *Guidelines* at II-30) ("the selection of different depreciation methods can have substantial effects on the earnings of two identical operations in any given year"); *id.* at 6 ("[t]his is a *legitimate* tax deduction . . . the very purpose of [which] is to *reduce* net income and thereby the amount of taxes otherwise owed") (italics added).  Contending tax and financial accounting methodologies differ hardly amounts to a "knowing misrepresentation" of the Dorseys' net farm income for TAA purposes.

[5]  *Cf.*, *e.g.*, 26 U.S.C. § 172(h)(2)(E) (accounting for extraordinary events in context of net operating loss deduction); 26 U.S.C. § 464(f)(3)(A)(ii) (impact of extraordinary circumstances on deductability of pre-paid farm related expenses); 26 U.S.C. §§ 1(h)(11)(D)(ii), 1016(a)(21) & 1059 (recognition that extraordinary circumstances may impact a property's cost basis or tax rate); 26 C.F.R. § 1.148-6(d)(3)(ii)(B) (tax exempt state/local bond accounting).  Interestingly, IRS regulations specifically recognize gains or losses from the disposal of fixed assets as extraordinary accounting items in certain contexts.  *See* 26 C.F.R. §§ 1.1502-76(b)(2)(ii)(C) (consolidated return filing) & 1.6655-2(f)(3)(ii) (annualized income installment methodology; *see also* Internal Revenue Bulletin 2007-38, T.D. 9347 (Sep. 17, 2007) (cmts. B, L & M).

accordance with GAAP may be taken as strong indication for determining the item is distortive, but not every distortion of net income is necessarily caused by an extraordinary item.

GAAP recognizes certain forms of accelerated depreciation as "systematic and rational" allocations of equipment cost over useful life, *see generally Miller GAAP Guide* 11.08-11.14, 21.06-21.07 (2008); however, extreme forms such as the section 179 deduction at issue do not comport with GAAP matching of equipment cost over each period of its useful economic life.  *Cf. American Silicon Technologies v. United States*, 261 F.3d 1371, 1379 (Fed. Cir. 2001) ("Commerce argues . . . it will normally accept a company's reported depreciation expense *unless there is an extreme allocation of depreciation to the first year*") (italics added).  For tax purposes, book-tax differences in depreciation are required to be disclosed by certain organizations on IRS Forms M-1 or M-3. Generally speaking, the wider the difference between taxable and GAAP-booked net income, the more the former distorts the latter.  *See*, *e.g.*, *American Silicon Technologies v. United States*, 23 CIT 237, 243 (1999) (accelerated depreciation method held "grossly" distortive).[6]  *See generally* Robert N. Anthony & James S. Reece, *Accounting Principles* 235-37 (7th ed. 1995).  *Cf.* FASB Statement No. 109 (1992); FASB Statement No. 96 (1987).  The Farm Financial Standards Council voiced a similar concern in the *Guidelines* in recognizing the use of tax-based depreciation methods for bookkeeping, but only up to a point:

> In today's environment, the FFSC does not believe that a tax-based depreciation charge would be materially misleading for most farm operations. However, the possibility of a change back to *highly accelerated* tax methods

---

[6]  *Rev'd on other grounds*, 334 F.3d 1033 (Fed. Cir. 2003).  *Cf.*, *e.g.*, *AIMCOR v. United States*, 23 CIT 621, 628, 69 F.Supp.2d 1345, 1352 (1999) ("[m]erely because an asset which has been fully depreciated is still being used does not mean that there has been a distortive shift away from systematically and rationally capturing the costs of the machinery and equipment").

is always possible. If such a change occurs, the acceptability of the tax-based methods *may need to be reconsidered.*

*Guidelines* at II-32 (italics added).

Small businesses, such as the Dorseys, are not required to file book-tax reconciliations on or with Schedule F or otherwise (although they may), but that does *not* mean their books do not "hold" such differences between GAAP net income and taxable net income from time to time. While 26 U.S.C. § 446(b) affords the Commissioner of the IRS discretion to require a taxpayer to change to a method of accounting in order to more "clearly reflect" net income for *tax* purposes, *see*, *e.g.*, *Hewlett-Packard Co. v. United States*, 71 F.3d 398 (Fed. Cir. 1995); *Ford Motor Co. v. Commissioner*, 71 F.3d 209, 213 (6th Cir. 1995); *Knight-Ridder Newspapers, Inc. v. United States*, 743 F.2d 781 (11th Cir. 1984), it may also be said, conversely, that a "taxable net income" figure permitted or mandated by the IRC or IRS regulations to be reported to the IRS does not *necessarily* "clearly reflect" true net income determined in accordance with GAAP.

III

The spirit of the question put to FAS, thus, was whether the section 179 expense at issue distorts the determination of the Dorseys' TAA net income.  That is a question of fact, not of law, to be decided by FAS in the first instance.  *See*, *e.g.*, *Commissioner v. Heininger*, 320 U.S. 467, 475 (1943) (whether or not a particular expenditure is ordinary and necessary and directly related to a business are "pure questions of fact in most instances"); *Hercules Inc. v. United States*, 626 F.2d 832 (Ct. Cl. 1980) (whether usage method of depreciation is in accordance with GAAP is clearly a question of fact).  *Cf. Steen*, 468 F.3d at 1364 (FAS did not have to consider "conten[tion] that [plaintiff's] tax returns distort the net amount of his income derived from all fishing sources in the

two relevant years" because claim was not raised).  If FAS's has "articulate[d] a satisfactory

explanation for its action including a rational connection between the facts found and the choice

made[,]" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

43, (1983), then its finding is conclusive upon the Court.  *See* 19 U.S.C. § 2395(b).  But FAS should

not lose sight of the fact that the reason for ordering reconsideration was to focus on the alleged

extraordinary *nature* of the section 179 deduction, *i.e.*, whether it distorted net income in fact and

should be excluded from a proper analysis (and determination) thereof.  *See* Slip Op. 08-32 at 4

("[t]he Dorseys' essential claim is that their tax returns present a distorted view of their TAA net

farm income").  *Cf. Steen*, *supra*; *Viet Do*, *supra*.

        The *Reconsideration* contends, nonetheless, that excluding the wind machine's section 179

deduction would be contrary to law and inconsistent with legal precedent.  Review of precedent has

already provided contraindication, however.  *See* Slip Op. 08-14 at 7-9; Slip Op. 08-32 at 3-4.

        *Steen*, *supra*, *Viet Do v. U.S. Secretary of Agriculture*, 30 CIT ___, 427 F.Supp.2d 1224

(2006) and *Selivanoff v. U.S. Secretary of Agriculture*, 30 CIT ___, Slip Op. 06-55 (2006), indicate

FAS has the duty to consider and analyze the impact of an "extraordinary item" claim in order to

determine a TAA net income figure that is not distorted.  *See*, *e.g.*, *Steen*, 468 F.3d at 1363 (implying

there may be instances where reliance upon tax return information *may* present a distorted picture

of net farm/fishing income for TAA purposes); *Selivanoff* (ordering analysis of (1) whether certain

accounting items are extraordinary and (2) if so, whether such items do or do not distort net fishing

income).  In particular, the standard FAS applied on remand in this matter contradicts the logic FAS

applied in *Viet Do*, wherein Agriculture argued net income from fishing does not include capital

gains and losses from the sale of assets.  *See* 427 F.Supp.2d 1224.  Agriculture's position in that

instance may not have been in conflict with certain IRS "regard" of capital gains and losses,[7] but it

confirms net income for TAA purposes is not necessarily equivalent to taxable net income.   In

contrast to FAS's position here, the capital gain of that instance was obviously "connected to" a

fishing business that produced the income FAS was obligated to consider (it would not have arisen

but for its "connection" to the fishing business), and yet it was excluded.   The exclusion, and

Agriculture's interpretation, were upheld as reasonable even though they were at odds with what

GAAP would consider to be "taxable" net income for the business concerned because, logically,

> [i]f Agriculture included the sale of business assets within the definition of
> net fishing income, then TAA may be given to producers whose income
> decreased because the sale of business assets inflated their income in one year
> and the lack of such sales decreased income in the next year, and not because
> the producers were adversely affected by trade.

427 F.Supp.2d at 1231.

That is another way of saying including the gain would have distorted the determination of

"net fishing income" for TAA purposes.[8]   And *Selivanoff* merely extended that logic to cover

distortions to TAA net income caused by extraordinary losses or expenditures.  *See* Slip Op. 06-55

at 9-13.   Specifically, the case held FAS to consider and elucidate *inter alia* on whether the

---

[7]  *See supra*, note 5.  The disposition of a fixed asset is specified not to be an extraordinary item under GAAP.  *See* APB Opinion No. 30, *supra*; *Guidelines* at II-22; *see also*, *e.g.*, *Accounting Principles*, *supra*, at 245.  Capital gain or loss therefrom is treated as a separate income line item on IRS Form 1040.

[8]  The fact that the gain appeared on IRS Form 1040 and not on "the" form (Schedule C) relied upon to determine TAA net income was apparently irrelevant because the gain had nonetheless been "reported to the IRS" on Form 1040 in compliance with 7 C.F.R. § 1580.102 (as amended as of November 1, 2004).  *Cf.* 427 F.Supp.2d at 1226-27, 1230, 1231.

plaintiff's claim that his "boat had pretty much depreciated out" constituted an extraordinary circumstance meriting exclusion from TAA net farm income. *See* Slip Op. 06-55 at 6, 13.

The logic of *Viet Do* and *Selivanoff* is relevant here. The *Reconsideration* reasons a "connected to" standard suffices for inclusion of the section 179 deduction in the determination of TAA net farm income, but if that were all that was necessary, *Viet Do* and *Selivanoff* would have had different outcomes. At a minimum, precedent indicates FAS was not without legal authority to exclude the section 179 deduction for the wind machine if its inclusion distorts the Dorseys' net farm business income for TAA purposes; thus, in addition to its interpretation of regulation of the circumstance at bar, FAS's contention that case law indicates otherwise was unreasonable.

Still, FAS argues *Viet Do* is distinguishable from the facts of this matter because that case involved the "disposal" of farm assets and this matter involves depreciation, which is "common, routine, and recurring" for any business assets. Although the first point apparently admits the record is sufficient to determine the wind machine was not actually "used up" in the year it was put into service,[9] the question of whether section 179 "depreciation" amounts to a "disposal" of assets has not been decided and would not appear to address whether the 179 deduction distorts TAA net farm income in any event. As to the second, it is not "depreciation" as a general concept that is the issue. The proposition that depreciation is "common, routine, and recurring" is valid (because, under GAAP, it is the "systematic and rational" allocation of equipment cost over its useful life), but, as indicated above, section 179 depreciation can hardly be said to meet those criteria. Section 179 is limited to certain property and expenses such property's full cost as soon as possible, subject to a

---

[9] Of some significance is the fact that the record shows no corresponding replacement expense for 2004.

statutory cap that determines the speed at which full depreciation is recognized for tax purposes, and it is not allocated over each economic period of the life of the property.  Similarly, FAS had declared in *Selivanoff* that "[d]epreciation of assets *is annual* and ordinary in any business[,]" Slip Op. 06-114 at 3 (italics added), and that standard is here likewise unsatisfied.  *See* 26 U.S.C. § 179.

IV

Ultimately, FAS concluded it had "no choice" but to find the section 179 depreciation of the wind machine "did not distort . . . true net farm income" and that such net income "did not decrease" from the 2003 pre-adjustment year to the 2004 marketing year, because section 179 is distinctly "a legitimate tax deduction . . . the very purpose of [which] is to reduce net income and thereby the amount of taxes otherwise owed." *Reconsideration* at 6.  Such reasoning is unpersuasive.

The notion that a particular year's "net income" is "made lower" as the result of taking a legitimate tax deduction is theoretically at odds with GAAP, which do not permit such manipulation.  Under GAAP, sources of income and expenses must be recognized and matched as incurred, and net income is not "reduced" *via* such accounting methodology, unless by quackery.  To the extent FAS's reasoning is intended to mean section 179 depreciation reduces the amount of income tax owing "as compared with" the amount of income tax that would otherwise have been owing, had a "systematic and rational" depreciation methodology been applied to the wind machine and the relevant deduction subtracted from revenue, "legitimacy" for tax purposes does not, *ipsi dixit*, equate to "undistorted" GAAP net income.  *See* 7 C.F.R. § 1580.301(e)(6).  In other words, the fact that a particular accounting item is determined to be part of the net income determined for tax purposes, as of and for a particular time period, does not directly lead to the conclusion that such IRS-reported net

income represents "true" undistorted GAAP net income.  *See supra*; *see also*, *e.g.*, *Anderson v. U.S. Secretary of Agriculture*, 30 CIT __, __, 462 F.Supp.2d 1333, 1340 (2006) (discussing distortions occasioned by cash versus accrual methods of accounting); *American Silicon*, *supra*, 23 CIT at 243 (addressing argument that accelerated depreciation method distorted net income).

FAS's reasoning is further problematic because it has the unintended consequence of *encouraging* manipulation via the timing of investment and section 179 depreciation, or as otherwise allowed under the IRC, in order that TAA cash benefits may thereby be obtained.  This is directly inapposite to the rationale FAS articulated in *Viet Do*.  If, hypothetically speaking, the Dorseys had chosen to put the wind machine into service and expense it in 2004 rather than 2003 and their 2004 taxable income was *thereby* reduced below that of 2003 (assuming, *ceteris paribus*, 2004 net income would otherwise have been higher), would FAS not here be defending a decision to exclude the section 179 deduction, on the authority of *Viet Do* and on the ground its inclusion would distort the proper comparison of the Dorseys' 2003 and 2004 net income (because the reduction in income was not "from" farm operations)?[10]

Lastly, FAS posits it had "no choice" but to rely on the documentation presented to it.  FAS did not, however, "rely on" or analyze all that was before it.  The Dorseys' bookkeeper directly pressed the argument the section 179 deduction distorted their 2003 (GAAP) net income, and FAS had sufficient information before it from which to determine whether their economic (GAAP)

---

[10] As a last aside, FAS's characterization of section 179 as a "legitimate tax deduction" as reason for denying TAA cash benefits might be interpreted as objection to presumed double-dipping. If so, the presumption is erroneous, as there does not appear to be any rational connection between the benefit of section 179 and TAA cash benefits, unless it be the fact that section 179 and TAA cash benefits work at cross purposes (promoting investment on the one hand and ameliorating disinvestment on the other), a circumstance for which the Dorseys bear no responsibility.

income for 2003 was higher or lower than for 2004. It was entirely possible one could have concluded from the evidence of record that the section 179 deduction was distortive of net income during the prior remand, the record confirms its amount, and its effects could have been alleviated, for example by substituting for 2003 and 2004 depreciation figures a "normal" (GAAP) basis of depreciation based on the equipment's MACRS class life (or expected life, if available). Such a calculation may be inexact, but it would theoretically result in a ballpark representation of 2003 and 2004 GAAP net income and only for the simple purpose of determining whether 2003 was higher or lower than 2004 net income. It is true that the Dorseys could have better pressed their argument, but under these *sui generis* circumstances it is rather FAS's "no choice" response that is unavailing.

### Conclusion

In light of the foregoing, in the absence of a "cogent" finding supported by substantial evidence that accepts or rejects the claim that the expensing of the wind machine in 2003 distorted the Dorseys' GAAP net income for TAA purposes for that year in comparison with 2004 net income, it was premature for FAS to declare the tax information the Dorseys submitted for consideration "accurately reflects" their "net farm income for TAA purposes." *See* 7 C.F.R. § 1580.301(e)(6). *Cf. Reconsideration* at 3, *with Heininger*, *supra*, 320 U.S. at 475 (extraordinary expenditures are question of fact), *and Motor Vehicle Mfrs. Ass'n*, *supra*, 463 U.S. at 48 (the "agency must cogently explain why it has exercised its discretion in a given manner"), *and Trinh v. U.S. Secretary of Agriculture*, 29 CIT ___, ___, 395 F.Supp.2d 1259, 1269 (2005) ("a party may contest an administrative determination by showing 'how the determination may be unwarranted by the facts to the extent that the agency may or may not have considered facts which, as a matter of law, should

or should not have been properly considered'") (referencing USCIT Rule 56.1(c)(1)(B)).  The matter must therefore again be remanded for reconsideration in accordance with this opinion.

As before, the results of remand shall be due within thirty (30) days of this opinion and order, comments thereon within fifteen (15) days thereafter, and no rebuttal without leave.

**SO ORDERED.**

/s/  R. Kenton Musgrave
R. KENTON MUSGRAVE, Senior Judge

Dated: July 11, 2008
         New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                              Deputy Clerk